UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re:

                                 Case No. 8-09-77670-reg

All Island Truck Leasing Corp.,

                    Debtor.            Chapter 7
-------------------------------------------------------------------x

## MEMORANDUM DECISION

Before the Court are the final applications pursuant to 11 U.S.C. § 330 for compensation for the Chapter 7 Trustee, Kenneth Kirschenbaum (the "Trustee") and counsel for the Trustee, Kirschenbaum & Kirschenbaum, P.C. ("K&K") as well as other professionals retained by the Trustee in the case of All Island Truck Leasing Corp. (the "Debtor"). In this case, the Trustee was appointed to a failed chapter 11 case with assets including numerous vehicles owned by the Debtor which appeared to have no equity, as well as a group of unencumbered vehicles and some cash on hand, which appeared to be subject to a blanket lien on the Debtor's assets. The Trustee was tasked with determining the lien status of the vehicles and deciding in a relatively short time span the extent to which the case should be administered. Ultimately, the Trustee was successful in generating an estate by administering the collateral of the secured creditors who agreed to provide the estate with a cash distribution pursuant to carve-out agreements, collecting accounts receivable, and selling unencumbered assets of the estate. In sum, the Trustee realized gross receipts of $863,479.97. After paying the secured creditors, the estate was reduced to $222,427.31. The Trustee seeks statutory commissions of $46,424 plus expenses of $462.65 and K&K seeks fees of $34,725 plus expenses of $942.38. The total amount of chapter 7 administration expenses requested are $202,544.66. Pursuant to the Trustee's Final Report (the "Final Report"), there will

be no distribution to unsecured creditors after a partial distribution for chapter 11 administration expenses is made.

There are many troubling aspects of this case.  First, the Court advised the Trustee at the initial hearing after the Debtor's case was converted that the Debtor's estate should not be administered solely for the benefit of the secured creditors and the professionals.  If the Trustee intended to negotiate a carve-out to administer assets which were subject to claimed liens, the Trustee should ensure that his efforts would benefit more than the Trustee and his professionals.  Second, the Trustee appears to have disregarded a stipulation with a secured creditor, which was so-ordered by the Court, specifically providing for a carve-out for the benefit of unsecured creditors.  Third, the Court advised the Trustee at the first hearing on the Trustee's final report and application for compensation that a reduction in compensation may be appropriate to allow for a distribution to creditors.  Despite these events, there has been no modification of the requests by the Trustee or K&K.  In fact, the Trustee has "doubled down" on his request by filing a supplemental affirmation claiming that it was too difficult to have known at the outset that administration of the estate would have generated no return for the unsecured creditors.

This Court acknowledges, as it has in the past, that the duties imposed on chapter 7 trustees by the Bankruptcy Code (the "Code") often entail difficult tasks, but by accepting the position, chapter 7 trustees are bound to fulfill those duties nonetheless.  The Trustee's and K&K's willful disregard of their fiduciary duties owed to the unsecured creditors in this case highlight a systemic failure to protect the very parties they are charged with serving.  The Court cannot turn a blind eye to such blatant conduct by a trustee and his retained professional as to do so would condone a breach of their fiduciary duties, which are implicit in the Code.  The Court is also troubled by the fact that the United States Trustee (the "UST"), which is charged with protecting the integrity of

the bankruptcy system, raised no objections to the applications, despite being actively solicited by the Court for comments. The apparent lack of concern by the UST notwithstanding, it remains the province of this Court to approve and award professional fees. Trustees are cloaked with quasi-judicial authority by the Code and by the Court; this Court must protect the integrity—including the appearance of integrity—of the system against flagrant abuses whereby administrative professionals profit from estate assets while conferring no benefit upon creditors. The Bankruptcy Code requires that a Trustee and retained professionals can only be compensated if their services provide a benefit to unsecured creditors. *See* 11 U.S.C. § 330. Since the Final Report proposes no distribution to unsecured creditors, the Trustee has failed to demonstrate that the Trustee and retained professionals have provided any benefit to unsecured creditors. Therefore, the Court shall adjourn the applications of the Trustee, K&K and the other professionals retained by the Trustee pending the submission of an amended Final Report and fee applications consistent with this Memorandum Decision.

## FACTS

The Debtor operated a business that leased vehicles to businesses and individuals. On October 9, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor's case was jointly administered with the chapter 11 case of AIT Trucking Corp.'s ("AIT"). The Debtor represented in its Schedule B that it owned 150 vehicles. Many of these vehicles were subject to security interests claimed by various secured creditors. On August 30, 2010, the Debtor made an unopposed oral motion to convert the cases of the Debtor and AIT to cases under chapter 7 of the Bankruptcy, which was granted by the Court. On September 2, 2010, an order converting the case was docketed and the Trustee was appointed as the chapter 7 trustee. On September 7, 2010, the Trustee filed an application to employ his own law firm, K&K,

as counsel to the Trustee. On September 10, 2010, an order authorizing the retention of K&K was docketed. The Trustee also retained an auctioneer, David R. Maltz & Co.[1] ("Maltz"), along with an affiliated company, Statewide Auto Auction, Inc.[2] ("Statewide"), to store the vehicles, an accountant, Hirshfield & Kantor LLP[3] ("Hirshfield") and special counsel for debt collection actions, David Chefec, P.C. ("Chefec").[4]

On September 22, 2010, a hearing was held on the Trustee's motion (the "Cash Collateral Motion") to use cash collateral of secured creditors Sovereign Bank ("Sovereign") and Navistar Financial Corporation ("Navistar"), to employ the former Chief Financial Officer of the Debtor, Mark Rauch ("Rauch"), and to authorize K&K to rent some of its office space to the estate for Rauch to use (the "Cash Collateral Hearing"). The Court acknowledged at the hearing, and acknowledges now, that the Trustee inherited a difficult case. The Trustee's required analysis as to whether administering assets would generate a benefit to the estate was complicated by the need to investigate the validity of liens of various secured creditors and the location of vehicles subject to leases, as well as to identify and marshal the Debtor's bank accounts, outstanding lease payments, other accounts receivable, and the many vehicles not in the Debtor's possession. The Trustee also had to analyze and update the business records of the Debtor, which were reportedly in a state of disarray. *See* Supplement to Trustee's Final Report, [dkt 235], pg. 4 (October 29, 2015) (the "Supplement"). At the Cash Collateral Hearing, the Trustee[5] indicated that he was in the process of negotiating two separate carve-outs from Sovereign—one to cover administrative

---

[1] Order Granting Application to Employ Maltz, [dkt 179] (October 8, 2010)
[2] Order Granting Application to Employ Statewide, [dkt 194] (November 9, 2010)
[3] Order Granting Application to Employ Hirshfield, [dkt 177] (October 1, 2010).
[4] Order Granting Application to Employ Chefec, [dkt 213] (August 4, 2011)
[5] For ease of reference, statements made and arguments advanced on the Trustee's behalf are stated as having been made by the Trustee, however, the Trustee appeared by his counsel, K&K, at every hearing except for the January 5, 2016 hearing, to which he was directed to attend.

expenses and one for distribution to unsecured creditors—and that negotiations for a similar carve-out with Navistar had fallen apart.[6]  The Court admonished the Trustee that the case should not be administered solely for the benefit of the secured creditors and the professionals and, accordingly, that the Trustee's actions must provide some benefit to unsecured creditors:

> We're not going to use the jurisdiction of this Court to satisfy the wants of the secured creditor when there's no benefit to the unsecured creditors… Unless that stip[ulation] with Sovereign somehow creates a benefit, however small, to the unsecured creditors in the case, which is distinct from the Trustee being able to access those funds in what's normally the waterfall, we're done.  We're not going on… Either the stip[ulation] clearly says that these funds go solely to the distribution to unsecured creditors, and that could be priority, but it goes to unsecured creditors and will not be used for administrative expenses, or we're done, I'm not doing it.

Hr'g Tr.  pgs 16-17 (Sept. 22, 2010).  The Trustee attempted to placate the Court by reiterating that the "whole goal [of the stipulation]… was to create an estate for the unsecured creditors." *Id* at 18.  The UST stated on the record that they did not object to the administration of the case pursuant to a carve-out agreement, given that the Trustee represented that there would be two separate carve-outs, and that the additional carve-out for the unsecured creditors would not be used "to double pay [the administrative expenses that] the Trustee has already received." *Id.* at 17.  Skeptical, the Court reiterated to the Trustee that "unless the unsecured creditors get something… this case is not staying here.  *Or the Trustee can continue to work for nothing*." *Id.* at 19 (emphasis added).  Additionally, the Court was troubled by the Trustee's plan to employ Rauch at an hourly rate and to have him work in office space that the estate would rent from K&K for $750 per month.[7]  The Trustee indicated that Rauch was necessary in order to unravel the records for the Trustee and to assist the Trustee in billing lessees as well as seeking the return of leased vehicles. Cash

---

[6] "It was going to be a carve-out specifically of $20,000, that was going to be a fund for distribution to the general unsecured creditors… there are two separate amounts."  Hr'g Tr. pg. 7 (Sept. 22, 2010).
[7] "The Court has a significant problem with the Trustee… acting as a landlord, renting out a portion of the Trustee's law firm's space and surcharging the estate for that." *Id*. at 14

Collateral Motion, [dkt 163] (Sept. 15, 2010). The UST acknowledged that the arrangement was unusual, but did not object to the employment of Rauch or the rental arrangement because "the payments were going to be made by the secured creditors out of their collateral and not out of the money that was going to be segregated for the benefit of the estate." Hr'g Tr. pgs 15 (Sept. 22, 2010).

On October 7, 2010, the Court entered an order vacating the automatic stay with respect to Navistar and its collateral, upon settlement of a proposed order by Navistar and the Trustee. On October 20, 2010, stipulations and orders for carve-outs from Navistar and Sovereign were each docketed. The stipulation with Navistar provided that, pursuant to § 506(c), the Debtor would retain $4,000 of Navistar's cash collateral, with $1,800 earmarked for K&K's legal fees and $2,200 earmarked for the Trustee's compensation and expenses, in order to compensate the Trustee for the services previously rendered for the benefit of Navistar. Stipulation and Order, [dkt 184] (Oct. 20, 2010) (the "Navistar Stipulation"). Pursuant to the terms of the Navistar Stipulation, the stay was vacated and the Trustee no longer administered Navistar's collateral.[8] The stipulation with Sovereign, however, contemplated the continuing administration of Sovereign's collateral, including the sale of the vehicles subject to Sovereign's lien, and addressed two separate carve-outs. Stipulation and Order, [dkt 186] (Oct. 20, 2012) (the "Sovereign Stipulation"). The first carve-out provided for administrative fees, including the Trustee's compensation earned for the sale of Sovereign's collateral, statutory commission for an auctioneer, reasonable fees and expenses incurred by K&K for Sovereign's benefit, $50 per hour for Rauch, and $750 per month to K&K as compensation for Rauch's "rental" of K&K's office space (the "Administrative Carve-

---

[8] Additionally, on March 8, 2011, the Court entered a stipulation and order between the Debtor and Navistar that provided that Navistar's secured claim was limited to $32,075.65, which is 5% of the total secured claim asserted by Navistar.

Out"). *Id.* at 3.  The second carve-out provided that "Sovereign shall fund, as a carveout [*sic*] from the proceeds of the Sovereign Collateral, an unsecured creditor's fund in the amount of $15,000, which shall be used by the Trustee *to make distributions on account of allowed unsecured claims* against the Debtors' bankruptcy estates." *Id.* at 4 (emphasis added).  The $15,000 was to be split equally between the Debtor's estate and that of AIT, equal to $7,500 each.  *See* Supplement, at p. 6.  By the express terms of the Sovereign Stipulation, and in accordance with the Court's directive at the Cash Collateral Hearing, the $7,500 was to bypass the administrative expenses and be distributed only to unsecured creditors.  Thereafter, the Trustee commenced the process of liquidating Sovereign's collateral through auction and private sale, which generated the bulk of the receipts in this case

On November 22, 2010, pursuant to the Sovereign Stipulation, the Court entered an order permitting interim payments from Sovereign's cash collateral, which provided for payments of: $5,266 for the Trustee's fees; $9,457.12 for K&K's fees and expenses; $750 to K&K for rent; and $6,821.25 for Rauch's fees. [dkt 196].  Additionally, the November 22, 2010 Order provided that "the [T]rustee is hereby authorized to deduct the sum of $7,500 from Sovereign's cash collateral for the benefit of the unsecured creditors of the estate;" with the rest of the funds to be disbursed to Sovereign. [dkt 196].  On December 6, 2010, at a hearing to approve the private sale of certain vehicles subject to liens by Sovereign, the Trustee reiterated that the proceeds from such sales would be distributed pursuant to the Sovereign Stipulation.  On January 31, 2011, the Court entered a second order permitting interim payments from Sovereign's cash collateral, which provided for payments of $17,674.90 for the Trustee's fees, $1,513 for K&K's fees, and $1,562.50 for Rauch's fees. [dkt 203].  On April 25, 2011, the Court entered a third order permitting interim payments from Sovereign's cash collateral, which provided for payments of $14,260 for the Trustee's fees,

$2,291 for K&K's fees, and $35,217.07 for Maltz's auctioneer's fees and expenses. [dkt 207].  On June 22, 2011, the Court entered a fourth order permitting interim payments from Sovereign's cash collateral, which provided for payments of $700 for the Trustee's fees and $1,040 for K&K's fees. [dkt 211].  On October 4, 2011, the Court entered a fifth order permitting interim payments from Sovereign's cash collateral, which provided for payments of $600 for the Trustee's fees, $471.25 for K&K's fees, and $10,918.50 in for Maltz's auctioneer's fees and expenses. [dkt 216].

On March 27, 2015, a stipulation and order between the Debtor and Bank of America was entered (the "Bank of America Stipulation"). [dkt 225].  The Bank of America Stipulation provided for the distribution of $60,908.37 of Bank of America's cash collateral between Bank of America, which would receive $20,000, and the Debtor's estate, which would receive a carve-out of $40,908.37 to cover administrative expenses.  The Bank of America Stipulation specifically stated that $5,000 would go towards bank fees, $3,042.42 would go towards the Trustee's commission, and the rest would go towards other chapter 7 administrative fees and expenses and, to the extent any funds remained after the aforementioned disbursements, the remainder would be distributed to chapter 11 administrative expenses.  Bank of America Stipulation, [dkt 225] (March 27, 2015). The Bank of America Stipulation did not include any distribution to unsecured creditors.  Together, the Navistar, Sovereign, and Bank of America Stipulations (collectively, the "Stipulations") provide for a total carve-out to the estate of $160,950.96.  Of this $160,850.96 brought in to the estate, pursuant to the terms of the Stipulations, $153,350.96 was earmarked exclusively for administrative expenses; only $7,500 was designated as available for distribution to unsecured creditors.

On May 29, 2015, the UST docketed the Final Report and applications for compensation of the Trustee, K&K, Hirshfield, and Chefec, all of which had been submitted to the UST by the

professionals for the UST's review.  On the same day, the UST docketed a statement: "The United States Trustee has reviewed the time records submitted by the Trustee and the fee application(s) submitted by the professional retained by the Trustee on behalf of the estate. The United States Trustee does not intend to file an objection."  The UST's docketed statement contains neither a discussion of any specific fee request nor the standard of review employed by the UST.  In fact, there is no actual statement to review to support the docket entry.  The Final Report indicated that secured creditors were to be paid $641,052.66, comprised as follows: $588,977.01 to Sovereign;[9] $32,075.65 to Navistar;[10] and $20,000 to Bank of America.  Final Report, [dkt 227] (May 29, 2015).  The Final Report further indicated that chapter 7 administrative claimants are to receive a total of $202,544.51, comprised as follows: $46,424[11] and $462.65 to the Trustee for fees and expenses, respectively; $34,725[12], $942.38[13], and $750[14] to K&K for fees, expenses, and rent, respectively; $3,921.25 and $55 to Hirshfield for fees and expenses, respectively; $53,718[15] and $6,723.57[16] to Maltz for fees and expenses, respectively; $33,905[17] to Statewide for expenses; $650 to the UST for fees; $3,707.97[18] and $8,176.09 to Chefec for fees and expenses, respectively; and $8,383.75[19] to Rauch for fees.  Additionally, the Final Report listed chapter 11 administrative fees and expenses claimed totaling $157,750.04, of which, claimants are to receive a 7.67% pro rata distribution of, in total, $12,096.02, comprised as follows: $2,729.27 and $122.64 to the

---

[9] Already paid in interim payments.
[10] Already paid in interim payments.
[11] $40,701.04 already paid in interim payments.
[12] $15,996.25 already paid in interim payments.
[13] $577.12 already paid in interim payments.
[14] Already paid in interim payments.
[15] Already paid in interim payments.
[16] Already paid in interim payments.
[17] Already paid in interim payments.
[18] Which reflects Chefec's voluntary reduction of his fees from $6,433.33 (a one third contingency fee for his collection of $19,300 for the estate). *See* Chefec Application for Compensation, Docket [231] (May 29, 2015).
[19] Already paid in interim payments.

Debtor's chapter 11 counsel for fees and expenses, respectively; $1,035 to the New York City Department of Finance; and $8,208.95 to the New York State Department of Taxation of Finance. Finally, the Final Report indicates that there were allowed priority unsecured claims of $884,745.80 and allowed general unsecured claims of $2,671,599.66, for which neither class would receive any distribution. Attached to the Final Report was a case narrative (the "Case Narrative"), describing, generally, the work done in the case. The Case Narrative detailed that the Trustee negotiated successfully with Sovereign, which agreed to have the Trustee administer its collateral in exchange for a carve-out for administrative expenses, in an unspecified amount, and $7,500 for creditors. The Case Narrative also explains that Navistar chose to administer its own collateral but nonetheless agreed to a $4,000 carve-out to pay for administrative expenses already incurred. The Case Narrative further explains that the Trustee did not believe that Navistar's liens were perfected and, so he negotiated an agreement with Navistar, whereby Navistar's secured claim would be fixed at 5% of what it initially asserted as a secured claim. Finally, the Case Narrative states that the Trustee sold unencumbered vehicles, thereby recovering $72,500 for the estate. Perplexingly, unless the Trustee applied unencumbered funds to the costs of administering encumbered assets, the administration of the unencumbered vehicles appears to have cost the estate $75,319.92 to administer.[20]

On July 15, 2015 a hearing on the Final Report was held, at which the Court expressed its concern to the Trustee and UST that the estate had been administered solely for the benefit of the secured creditors and administrative professionals. The UST indicated that it had no objections,

---

[20] The Trustee administered unencumbered assets of $72,500 in vehicles and $7,415.94 recovered by Chefec, net of Chefec's fees and expenses. However, only $12,096.02 is proposed to be distributed beyond the chapter 7 administrative fees; $7,500 of which is from the Sovereign Stipulation carve-out. Therefore, the unencumbered assets only produced $4,596.02 net of administrative expenses, which, accounting for the $7,415.94 net recovery by Chefec, illustrates that $2,819.92 of the Chefec recovery was applied towards the administration of the unencumbered vehicles, in addition to the $72,500 realized by the sale of the unencumbered vehicles.

given the difficulties faced by the Trustee in this case.  The UST failed to point out that its support of the Cash Collateral Motion was premised in part upon the unfulfilled promise that the Trustee's negotiated carve-out would provide a distribution to unsecured creditors.  The Trustee contended that the approval of the administrative fees was warranted, even if no distribution was made to unsecured creditors, on the basis that trustees often cannot determine at the beginning of the case whether the administration of an estate will result in a distribution.  The Trustee additionally argued that, while generally a case should be administered for the benefit of the unsecured creditors, given that the Trustee and his professionals have been working on this case for years, it would be unfair to apply this standard after the work was completed and fees were incurred.  The Court suggested that the Trustee review the Final Report and fee applications and make appropriate changes so that some distribution could be made to the unsecured creditors, including, if the Trustee so desired, for the Trustee and/or K&K to voluntarily reduce their fees, as Chefec had done.  The Court adjourned the matter for further hearing, at which the Trustee, personally, was directed to appear.

On October 29, 2015, the Trustee filed the Supplement. [dkt 235].  In the Supplement, the Trustee argued that trustees are not always able, at the beginning of the case, to determine the extent to which there will be a distribution, an uncertainty that is "compounded in cases, such as this one, where there are multiple secured creditors… holding overlapping liens." Supplement at p. 2.  The Trustee stated that most courts have approved the decision to administer "an estate when distribution is made to priority tax creditors based upon non-dischargeable debts, with nothing going to the pool of general unsecured creditors," and that "courts in all districts recognize that on occasion an estate will be administered and only administrative creditors are paid." Supplement at p. 2.  The Trustee cited difficulties, at the outset of the case, in determining the extent to which property of the Debtor was subject to a properly perfected security interest.  The Trustee stated that his duty to preserve

the Debtor's assets against loss or diminution forced him to act expeditiously to recover the Debtor's vehicles, bank accounts, and accounts receivable, which required assistance from former employees of the Debtor, including Rauch, in order to reconcile the Debtor's disorganized records.  According to the Trustee, there were unencumbered vehicles, and vehicles for which the security interests were never perfected, with substantial value and that once the Trustee "was in possession of the vehicles [he had] to dispose of them expeditiously because of the exorbitant cost of storing them."  Supplement at p. 5. The Trustee further indicates that he did not know what chapter 11, pre-conversion, administrative claims would be filed, making his decision as to whether to administer the assets even more difficult. The Trustee states in the Supplement that, ultimately, the Trustee decided, after negotiations with Sovereign, to administer the assets pursuant to a "carve-out of $7,500.00 for the benefit of the unsecured creditors and to payment of the Chapter 7 administrative fees and expenses incurred in connection with the administration of its collateral."  Supplement at p. 5-6.  Additionally, the Trustee argued that filing a 'no asset report' would reward the Debtor "and the secured creditor would be damaged to the extent that the value of the un-administered assets either erodes or is lost altogether." Further, the Trustee asserted that "the secured creditors were the primary, but not the only, beneficiaries of the administration of the Estate assets," in that the chapter 7 administrative fees were paid by the secured creditor and "the Chapter 11 administrative creditors, who are receiving a pro rata distribution, are unsecured creditors and they too were beneficiaries of [the Trustee's] administration of this case." Supplement at p. 7.  Relatedly, the Trustee states that the Trustee and his firm, K&K "were not the only professionals that received compensation, and the administration of those assets was not primarily for the benefit of me or my counsel. Creditors of the Estate were the primary beneficiaries." Supplement at p. 7.

On January 5, 2016, the Court held an additional hearing on the Final Report, at which the UST, Trustee, and K&K appeared.  At the hearing, the UST reiterated that it did not object to the fees

requested in this case, despite to the fact that unsecured creditors would not receive a penny, and noted that to the extent any chapter 7 administrative fees were reduced, the Bankruptcy Code's distribution scheme provides that those funds would be distributed to chapter 11 administrative professionals. The UST's position surprised the Court, given that it is the UST's duty to oversee and protect the process and that, at the Cash Collateral hearing, the UST indicated that it would have objected to the relief sought by the Trustee but for the benefit that the Trustee was promising to provide to unsecured creditors. The Trustee insisted that, while he agrees that cases generally should not be administered for the benefit of only the secured creditors and administrative professionals, this case was not the best case for the Court to review. The Trustee argued that the Court's opinion and policy on administration of estates has changed in the five years since conversion of the case, and as such, the Trustee had no notice of the new policy in this case and it would, therefore, be unfair to apply this new policy to this case. At the conclusion of the hearing, this matter was deemed submitted.

## DISCUSSION

### Review of Fee Applications by the U.S. Trustee and the Bankruptcy Court

The U.S. Trustee program (the "U.S. Trustee") was created "to promote the efficiency and protect the integrity of the Federal bankruptcy system." *About the Program*, U.S. DEP'T OF JUSTICE, U.S. TRUSTEE PROGRAM, http://www.justice.gov/ust/about-program (last updated (Feb. 9, 2016). The U.S. Trustee exists to protect against actual impropriety and, just as importantly, appearances of impropriety, in the bankruptcy system, which harm the public perception of the system;

> "One of the United States trustee's principal *raisons d'etre* is to guard and protect the bankruptcy system. Before the advent of the United States trustee, parties could and would agree to all sorts of extra-legal or at least unanticipated and unauthorized

practices to the ultimate detriment of the bankruptcy system. For example, trustees would routinely act as collection agents for secured creditors without any hope for recovery for the benefit of the general estate. The United States trustee now monitors such activities and objects not because parties in interest may be harmed by the action, but merely to protect the integrity of the system."

*In re Dow Corning Corp.*, 194 B.R. 147, 148-49 (Bankr. E.D. Mich. 1996). Among the duties imposed this office by Congress is that the U.S. Trustee "shall…supervise the administration of cases and trustees in cases…by, whenever the United States trustee considers it to be appropriate… reviewing, in accordance with procedural guidelines adopted by the Executive Office of the United States Trustee… applications filed for compensation and reimbursement under section 330 of title 11." 28 U.S.C. § 586(a)(3)(A)(i). While the U.S. Trustee is only required to participate in the review of fee applications when it deems appropriate, nonetheless, "once having determined that participation is appropriate [there is] nothing in the statute that authorizes less than full, active, and vigorous participation… such that this court should have had to do little more than approve or disapprove objections filed by that office." *In re Poseidon Pools of Am., Inc.*, 180 B.R. 718, 782 (Bankr. E.D.N.Y. 1995).

Notwithstanding the duty of the U.S. Trustee to review fee applications, the Court has an independent duty to do so, as well. *See* 11 U.S.C. § 330; *In re Drexel Burnham Lambert Grp., Inc.*, 133 B.R. 13, 15 (Bankr. S.D.N.Y. 1991). The Court must "examine the propriety of fees and expenses even where no objections are raised," *In re Poseidon Pools of Am., Inc.*, 180 B.R. 718, 728 (Bankr. E.D.N.Y. 1995); Congress vested bankruptcy courts with the authority to *sua sponte* "award compensation that is less than the amount of compensation that is requested." 11 U.S.C. §330(a)(2). That the Court is obligated to review fee applications "is intended to supplement the duties imposed upon the trustee and U.S. Trustee [and] in no way replaces or abrogates such responsibilities." *Poseidon Pools*, 180 B.R. at 782.

14

**Compensation of a Trustee and Retained Professionals**

I.       Chapter 7 Trustee's Duties With Respect to Fully Encumbered Assets

A chapter 7 trustee is a fiduciary of the estate whose principal duty is to administer estate property so as to maximize distribution to unsecured creditors, whether priority or general unsecured. *See In re C. Keffas & Son Florist, Inc.*, 240 B.R. 466, 474-5 (Bankr. E.D.N.Y. 1999); *In re Luongo*, 259 F.3d 323, 340 n.3 (5th Cir. 2001); *United States v. Sims (In re Feiler)*, 218 F.3d 948, 952 (9th Cir. 2000); *McCuskey v. Central Trailer Servs., Ltd.*, 37 F.3d 1329, 1331 (8th Cir. 1994); *PBGC v. Pritchard (In re Esco Mfg. Co.)*, 33 F.3d 509 (5th Cir. 1994); *In re Rigden*, 795 F.2d 727, 730 (9th Cir. 1986); *In re Farmer*, 786 F.2d 618, 621 (4th Cir. 1986); *In re Moon*, 258 B.R. 828, 832 (Bankr. N.D. Ill. 2001); *In re Dow Corning Corp.*, 255 B.R. 445, 523 (E.D. Mich. 2000); U.S. DEP'T OF JUSTICE, EXECUTIVE OFFICE FOR U.S. TRUSTEES, HANDBOOK FOR CHAPTER 7 TRUSTEES (October, 1, 2012) (hereinafter "U.S. Trustee Handbook") available at: https://www.justice.gov/ust/file/Handbook_for_Chapter_7_Trustees.pdf/download, at p. 4-1; *see also* Hon. Steven Rhodes, The Fiduciary and Institutional Obligations of A Chapter 7 Bankruptcy Trustee, 80 Am. Bankr. L.J. 147, 164 (2006).  Prior to administering an asset of the estate, a trustee must determine that doing so will fulfill the aforementioned duty—a trustee must prospectively analyze whether an asset will provide a net benefit, after payment of necessary secured claims and costs of administration, that will be distributable to unsecured creditors. *See In re Shades of Beauty, Inc.*, 56 B.R. 946, 950 (Bankr. E.D.N.Y. 1986); *see also* U.S. Trustee Handbook, at p. 4-1 ("[T]he trustee must consider whether sufficient funds will be generated to make a meaningful distribution to unsecured creditors, including unsecured priority creditors, before administering a case as an asset case."); U.S. Trustee Handbook, at p. 4-3 ("Prior to administering a case as an asset case, the trustee must consider whether sufficient funds will be generated to make a meaningful distribution

to unsecured creditors. The trustee must review the bankruptcy schedules to make a preliminary determination as to whether there appears to be assets in the case.... The trustee must conduct an independent investigation to make this determination.").  Accordingly, a trustee generally may not administer an asset that is fully encumbered, as doing so cannot provide a benefit to unsecured creditors, but must instead abandon that asset. *In re KVN Corp., Inc.*, 514 B.R. 1, 5-6 (B.A.P. 9th Cir. 2014) ("[S]ales of fully encumbered assets are generally improper. In that instance, the trustee's proper function is to abandon the property, not administer it, because the sale would yield no benefit to unsecured creditors."); *see also* U.S. Trustee Handbook, at p. 4-7 ("In asset cases, when the property is fully encumbered and of nominal value to the estate, the trustee must immediately abandon the asset and contact the secured creditor immediately so that the secured creditor can obtain insurance or otherwise protect its own interest in the property."); U.S. Trustee Handbook, at p. 4-16 ("Generally, a trustee should not sell property subject to a security interest unless the sale generates funds for the benefit of unsecured creditors. A secured creditor can protect its own interests in the collateral subject to the security interest.").  Trustees occasionally seek to sell fully encumbered assets with the secured creditor's consent pursuant to a carve-out agreement whereby the secured creditor waives some of its rights to the proceeds of an asset.  Such carve-outs are presumptively improper unless they provide some benefit to unsecured creditors; a carve-out that merely benefits administrative professionals is improper. *KVN Corp*, 514 B.R. at 6-8; U.S. Trustee Handbook, at p. 4-14 ("A trustee may sell assets only if the sale will result in a meaningful distribution to creditors. In evaluating whether an asset has equity, the trustee must determine whether there are valid liens against the asset and whether the value of the asset exceeds the liens. The trustee may seek a 'carve-out' from a secured creditor and sell the property at issue if the 'carve-out' will result in a meaningful distribution to creditors".).

II.    Standard for Awarding Compensation to a Chapter 7 Trustee

A "court may award to a trustee… reasonable compensation for actual, necessary services rendered by the trustee" and "reimbursement for actual, necessary expenses."   11 U.S.C. § 330(a)(1)(A) and (B).  A service is necessary if it provides a benefit to the estate. *In re Acme Cake Co., Inc.*, 495 B.R. 212, 218 (Bankr. E.D.N.Y. 2010) (citing *In re Kohl*, 421 B.R. 115, 125 (Bankr. S.D.N.Y. 2009)).  "The test considers whether services provided were 'reasonably likely to benefit the estate.' The test is objective, considering the services that a reasonable [officer] would have performed in the same circumstances." *In re Kohl*, 421 B.R. at 125 (citing *In re Ames Dept. Stores, Inc.*, 76 F.3d 66 (2d Cir. 1996)); *see also* 11 U.S.C. § 330(a)(4)(A)(ii)(I) ("the court shall not allow compensation for… services that were not… reasonably likely to benefit the debtor's estate."). Services are, therefore, not compensable unless they were reasonably likely to provide a benefit to unsecured creditors. *See generally In re New England Metal Company, Inc.*, 155. B.R. 38 (Bankr. D.R.I. 1993) (denying administrative fees where it was reasonably apparent while the services were being provided that there would be no distribution to unsecured creditors).  Accordingly, services provided in connection with a carve-out agreement with a secured creditor are not necessary unless that carve-out agreement provides a benefit to the unsecured creditors.  Provided that a service is necessary, and therefore compensable, pursuant to § 330(a)(7) "[i]n determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326," which provides:

> the court may allow reasonable compensation under section 330… for the trustee's services… not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000… upon all moneys disbursed or turned over in the case by the trustee to *parties in interest*, excluding the debtor, but including holders of secured claims.

11 U.S.C. § 326(a) (emphasis added).  Essentially, § 326 implicates the determination of the reasonableness of the requested compensation, which is fixed as a commission pursuant to the statutory formula, but remains nonetheless subject to the requirement embodied in § 330 that the compensation be for services that are necessary.

In calculating disbursements, for § 326(a) purposes, payments made to retained professionals as administrative fees may not be included, as retained professionals are not properly 'parties in interest.'  *In re McBrearty*, 335 B.R. 513 (Bankr. E.D.N.Y. 2005) (citing *In re Testaverde*, 317 B.R. 51 (E.D.N.Y. 2004) (which held that trustee's counsel is not a party in interest because "[t]rustee's counsel does not have a pecuniary interest that is directly affected by the bankruptcy proceeding. Rather, trustee's counsel is an entity hired to assist trustee [sic], who is the administrator of the debtor's estate.") and *In re Guido*, 236 B.R. 562 (Bankr. E.D.N.Y. 1999) (which held that special counsel, a debtor's personal injury attorney, was not a party in interest, and thus payments to special counsel may not be included as disbursements for calculating a trustee's fees.).  While it has been the practice in this District to include such payments when calculating disbursement, the Court believes that the relevant provisions of the Bankruptcy Code do not support this practice.  Additionally, if a trustee breaches his fiduciary duties, denial of compensation is warranted.  *In re Thorogood*, 22 B.R. 725, 728 (Bankr. E.D.N.Y. 1982) ("The duties of a trustee to abide by the Bankruptcy Rules and not to exceed the bounds of his authority are inherent in the office of the trustee. Breach of these fiduciary duties clearly warrants denial of compensation.").

III.    Standard for Awarding Compensation to Professionals Retained by a Chapter 7 Trustee

Pursuant to § 327 of the Code, "the trustee, with the court's approval, may employ one or more attorneys… or other professional persons, that do not hold an interest adverse to the estate,

and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's

duties under this title." 11 U.S.C. § 327(a).  Retained professionals may be awarded "reasonable

compensation for actual necessary services rendered."  11 U.S.C. § 330.  Unlike a trustee, retained

professionals are not entitled to a commission under § 326:

> In determining the amount of reasonable compensation to be awarded to [a]…
> professional person, the court shall consider the nature, the extent, and the value of
> such services, taking into account all relevant factors, including—
>     **(A)** the time spent on such services;
>     **(B)** the rates charged for such services;
>     **(C)** whether the services were necessary to the administration of, or
> beneficial at the time at which the service was rendered toward the completion of,
> a case under this title;
>     **(D)** whether the services were performed within a reasonable amount of
> time commensurate with the complexity, importance, and nature of the problem,
> issue, or task addressed;
>     **(E)** with respect to a professional person, whether the person is board
> certified or otherwise has demonstrated skill and experience in the bankruptcy field;
> and
>     **(F)** whether the compensation is reasonable based on the customary
> compensation charged by comparably skilled practitioners in cases other than cases
> under this title.

11 U.S.C. 330(a)(3).  However, whether the services performed by retained professionals were

"necessary", pursuant to § 330, is subject to the same requirements and standard of review as for

compensation of a trustee under § 330, as discussed above. 11 U.S.C. § 330.  Therefore, a retained

professional, like a trustee, should only be compensated for services that provide a benefit to the

unsecured creditors. *See Acme Cake* 495 B.R. at 218; *Kohl*, 421 B.R. at 125; *In re New England

Metal Company, Inc.*, 155. B.R. at 39.  Additionally, a retained professional "is never entitled to

compensation for performing duties which the [Code] imposes upon the trustee." *Shades of Beauty,

Inc.*, 56 B.R. at 949.  Retained attorneys may only be compensated for services for which a law

license is required. *Id.*, at 949.  One such service that a trustee is duty bound to provide and,

therefore, may not delegate to professionals, is filing a final report that designates the distributions

to each class. 11 U.S.C. §704(a)(9) ("The trustee shall…make a final report and file a final account of the administration of the estate with the court and the United States Trustee.").

A trustee and retained professionals may be awarded interim compensation, for which funds may be disbursed, prior to the final report, upon application.  11 U.S.C. § 331.  However, once the Court fixes the total amount of compensation, any interim compensation will be reduced from that total "and, if the amount of such interim compensation exceeds the amount of compensation awarded under [§ 330, the court] may order the return of the excess to the estate." 11 U.S.C. § 330(a)(5).

Compensation of a trustee and retained professionals, including professionals retained by a chapter 11 debtor, under § 330 are designated administrative claims pursuant to §503(b)(2).  11 U.S.C. § 503(b)(2).  Claims for administrative expenses allowed under §503(b) are given second priority for distribution of unencumbered funds.  11 U.S.C. § 507(a)(2).  Pursuant to § 726, if a case is converted from chapter 11 to chapter 7, the chapter 7 administrative claims are given priority over the chapter 11 administrative claims, but the chapter 11 administrative claims retain their priority status as against other classes of claims.  11 U.S.C. § 726(b).  Essentially, pre-conversion administrative expenses remain administrative expenses and are not transformed into unsecured claims, as the Trustee erroneously stated in the Supplement. *See* Supplement, at p. 7.

## ANALYSIS

### Trustee's Fees

The Trustee had a fiduciary duty to administer assets so as to provide a benefit to the unsecured creditors.  In this respect, the Trustee absolutely failed.  The Trustee administered

secured property, unsecured property worth $72,500, and, through Chefec, brought $7,415.94, net of Chefec's fees and expenses, into the estate. However, of the $214,640.53 available for distribution, the Trustee proposed to give exactly nothing to any priority unsecured or general unsecured creditors, while proposing to pay himself $46,424 and his law firm $34,725, in fees. The proposed $0 distribution to unsecured creditors is in contravention of the Sovereign Stipulation that the Court so-ordered, which provided for a $7,500 carve-out reserved solely for unsecured creditors. The Trustee breached his fiduciary duty by administering assets with no reasonable likelihood of providing any benefit to unsecured creditors, including no reasonable likelihood that the $7,500 carve-out would actually be available for distribution to unsecured creditors. Additionally, pursuant to *McBrearty*, 335 B.R. 513, the Trustee miscalculated his proposed commission by including distributions to retained professionals as disbursements to parties-in-interest. The Court has afforded the Trustee the opportunity to make corrections to the Final Report so as to be consistent with the Trustee's fiduciary duty to the unsecured creditors. The Trustee's decision to make no such corrections warrants the issuance of this Memorandum Decision explaining the duties of a Trustee and the standards for compensation of a Trustee and his retained professionals.

The Trustee proposed no distribution to priority unsecured or general unsecured creditors. The Trustee's argument that the pre-conversion chapter 11 administrative creditors are unsecured creditors, and therefore the distribution of $12,096.02, to the chapter 11 administrative claimants is a benefit to unsecured creditors is legally incorrect. As discussed above, chapter 11 administrative creditors are exactly that—administrative creditors—that have been subordinated to the post-conversion chapter 7 administrative creditors, yet have retained their administrative

priority status relative to priority unsecured and general unsecured creditors. *See* 11 U.S.C. §726(b).

The Court does not question that the Trustee performed work on this case, nor does the Court object to the rates charged and time spent by the professionals.  But this Court concludes that despite the Trustee's effort, he provided no benefit to unsecured creditors.  In this case, based on the Trustee's prior representations to the Court and entry of the Sovereign Stipulation, a result that provides no benefit to the unsecured creditors is unacceptable.  The Trustee's argument of lack of notice is not supported by the record.  The Trustee should have been independently aware of his duties and was warned by the Court, on multiple occasions, that the Trustee and retained professionals would only be compensated if he provided a benefit to unsecured creditors.  The Court expressly admonished the Trustee at the beginning of the case to ensure that any carve-out arrangement would provide for a distribution to unsecured creditors.  The Trustee repeatedly assured the Court that there would be at least $7,500 distributed to the unsecured creditors, and the $7,500 carve out was expressly and specifically designated for distribution to unsecured creditors by the Sovereign Stipulation, which would not have been signed by the Court, nor would have the rest of the carve-out stipulation and orders, had the initial carve-out not provided for unsecured creditors.  The Court gave the Trustee an opportunity to remedy the Final Report and proposed distribution, but the Trustee has refused.  Since, pursuant to the current proposed distribution, none of the Trustee's services provided any benefit to the unsecured creditors, none of those services can be deemed necessary.  Accordingly, since none of the work done by the Trustee constitutes necessary services, the statutory commission embodied in § 326 is not implicated.[21]  Under the

---

[21] While most cases dealing with reducing compensation under § 326 and § 330 commence with an analysis of the requested commission and then continue with an analysis of reasonableness under § 330, those cases deal with instances where there are some "necessary," and therefore compensable services, as each involved a distribution to priority or general unsecured creditors, and, accordingly, presuppose that some amount of compensation is warranted.

proposed distribution, therefore, the Trustee is not entitled to any reasonable compensation for actual, necessary services, pursuant to § 330.

Finally, the Trustee's proposed compensation violates § 326 in that it calculates his commission based upon total receipts, and not upon disbursements to parties in interest; the Trustee is not entitled to the requested compensation to the extent that the Trustee's commission is calculated from funds disbursed to retained professionals. *See McBrearty*, 335 B.R. 513 (Bankr. E.D.N.Y.). The Trustee is directed to submit an amended proposed distribution, consistent with this decision and his duties as a Trustee, at which point the Court will determine the extent to which the Trustee is ultimately entitled to compensation.

## K&K's Fees

K&K may only awarded reasonable compensation for actual, necessary services provided to the estate. As such, K&K is only eligible for compensation if it provided a benefit to unsecured creditors. As with the Trustee, this Court does not question that K&K performed work on this case, or that the rates charged and time spent were reasonable. However, none of the services performed provided any benefit to the unsecured creditors.

To the extent that K&K provided services to the Trustee in administering encumbered assets—worth approximately $800,000—all but $7,500 was designated for distribution to either the secured creditors or the administrative claimants. To the extent that K&K provided services to the Trustee in administering unencumbered assets, they only realized a net return, after

---

Here, since the necessity of the work done in this case has not been established, it is appropriate to first analyze whether there were necessary services performed, and only then determine whether the statutory maximum is warranted pursuant to the formula set forth in § 326. *See generally In re Scoggins*, 517 B.R. 206 (Bankr. E.D. Cal. 2014); *In re Mack Properties, Inc.*, 381 B.R. 793 (Bankr. M.D. Fla. 2007); *In re Phillips*, 392 B.R. 378 (Bankr. N.D. Ill. 2008); *In re Clemens*, 349 B.R. 725 (Bankr. D. Utah 2006); and *In re Ward*, 366 B.R. 470 (Bankr. W.D. Pa. 2007).

deducting chapter 7 administrative fees, of $4,596.02.[22]  The Trustee and K&K's argument that, at the time, they believed there would be a benefit to unsecured creditors because they did not know the amount of chapter 11 administrative claims is not supported by the record.  If the Trustee and K&K actually believed that the chapter 11 administrative claims would be less than $12,096.02, such that there would be some distribution to unsecured creditors, then that belief was unreasonable and without basis.  K&K and the Trustee are seasoned bankruptcy practitioners who are well aware of the expenses of administering a bankruptcy case and either knew or should have known that the chapter 11 administrative expenses would exceed the return, net of chapter 7 administrative expenses.  K&K had notice from the outset of the case not to run up bills in the administration of assets from which there would be no return to unsecured creditors.

Since, pursuant to the proposed distribution, K&K's services provided no benefit to unsecured creditors, K&K is not entitled to any compensation under § 330.  The fee applications of K&K and the other retained professionals will be held in abeyance until the Trustee submits an amended final report and proposed distribution, at which time the Court will make a ruling on the applications consistent with this Memorandum Decision.

---

[22] $7,500 deducted from the $12,096 proposed distribution to chapter 11 administrative creditors

## CONCLUSION

The Trustee is directed to submit an amended final report, inclusive of proposed distributions consistent with this Memorandum Decision.  The Court will hold an additional hearing, at a date to be determined, and will determine whether, in light of the changed proposed distribution, the Trustee and retained professionals are entitled to compensation.  An order consistent with this Memorandum Decision shall be entered forthwith.



**Dated: Central Islip, New York**
**March 2, 2016**

**Robert E. Grossman**
**United States Bankruptcy Judge**